1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES ALEXANDER,

11              Plaintiff,                      No. 2:08-cv-2773 MCE KJN P

12         vs.

13   CALIFORNIA DEPARTMENT
     OF CORRECTIONS, et al.,                    ORDER and
14
                Defendants.                     FINDINGS AND RECOMMENDATIONS
15   _____/

16   I. Introduction

17              Plaintiff is a state prisoner, proceeding in forma pauperis and without counsel, in

18   this civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff was incarcerated at High

19   Desert State Prison ("HDSP") when he filed this action on November 19, 2008.  Plaintiff was

20   transferred to California State Prison-Corcoran ("CSP-COR") in August 2009, and to California

21   State Prison-Centinela ("CSP-CEN") in June 2011, where he is currently incarcerated under the

22   authority of the California Department of Corrections and Rehabilitation ("CDCR").  Plaintiff

23   challenges, on federal constitutional grounds, a California regulation that prohibits state inmates

24   from possessing "sexually explicit material," as defined by Section 3006(c)(17), title 15, of the

25   California Code of Regulations ("Section 3006(c)(17)").  Pending is defendants' motion for

26   summary judgment, filed April 29, 2011.  Plaintiff filed an opposition; defendants filed a reply.

                                              1

1  Plaintiff thereafter filed a "Supplemental Opposition," which the court strikes as an

2  impermissible surreply.  For the reasons set forth herein, the undersigned recommends that

3  defendants' motion for summary judgment be granted.

4  II.  Background

5          This case proceeds on Claims 10 through 20, and 26, of plaintiff's Second

6  Amended Complaint ("SAC" or "complaint"), filed February 12, 2009 (Dkt. No. 13).  (See Dkt.

7  No. 34 at 3.)  Plaintiff contends that on May 13, 2008, defendants HDSP correctional officers

8  Barron and Wedemeyer (sued as "Wedemire"), "injured/violated plaintiff's constitutional rights .

9  . . when they confiscated three of his magazines that, 'when taken as a whole,' were not obscene,

10  but that displayed female nudity (1 Penthouse, 1 Playboy, and 1 Hustler magazine)."  (Dkt. No.

11  13 at 7-8 (SAC, Claim 20).)  Plaintiff contends that the policy underlying this confiscation, set

12  forth in Section 3006(c)(17), violates his First Amendment right to freedom of expression.  (See

13  generally Claims 10-14.)  Plaintiff further contends that enforcement of the challenged regulation

14  violates his rights under the Eighth Amendment's proscription against cruel and unusual

15  punishment (Claims 15, 26); the Fourteenth Amendment's Equal Protection Clause (Claims 16,

16  17); the First Amendment's Establishment Clause (Claim 18); and the Fourth Amendment's

17  proscription against unreasonable seizures (Claim 19).  (Id. at 7.)

18          In addition to defendants Barron and Wedemeyer, this action proceeds against

19  former CDCR Director Jeanne Woodford, and former CDCR Deputy Director John Dovey (who

20  served as Director of CDCR's Division of Adult Institutions).  Plaintiff contends that defendants

21  Woodford and Dovey were responsible for enacting and/or enforcing the challenged regulation.

22  Defense counsel informs the court that defendant Woodford was CDCR Director from February

23  23, 2004, to June 30, 2005; that she was appointed to the position of CDCR Undersecretary on

24  July 1, 2005; and that she retired from state service on July 5, 2006.  (Dfs. Ex. B.)  Defense

25  counsel further states that defendant Dovey was appointed to head CDCR's Division of Adult

26  Institutions on July 1, 2005, and remained in that position until his retirement on December 31,

1  2006.  (Id.)

2  III.  Plaintiff's "Supplemental Opposition"

3              Plaintiff filed a "Supplemental Opposition" (Dkt. No. 103), in response to

4  defendants' reply brief.  While plaintiff acknowledges that such briefing is generally

5  inappropriate, he asserts that the brief responds only to "new matters" raised by defendants in

6  their reply.

7               Neither the Federal Rules of Civil Procedure, nor the Local Rules of this court,

8  provide for the filing of a surreply.  Local Rule 230(*l*), contemplates the filing of only a motion,

9  opposition and reply.  Nevertheless, if a party raises a new argument or presents new evidence in

10  a reply brief, the court may consider these matters only if the adverse party is given an

11  opportunity to respond.  El Pollo Loco v. Hashim, 316 F.3d 1032, 1040-41 (9th Cir. 2003).

12              This court has reviewed the substance of defendants' reply, and plaintiff's

13  "Supplemental Opposition."  The court finds that defendants presented no new evidence or

14  arguments in their reply; rather, the reply is responsive to the arguments set forth in plaintiff's

15  opposition.

16              Accordingly, plaintiff's "Supplemental Opposition" is stricken, and will be

17  disregarded.  Although plaintiff's "Supplemental Opposition," includes his belatedly-filed

18  "Statement of Undisputed Facts," this case involves very few relevant facts, which are not

19  impacted by the striking of plaintiff's brief "Statement."

20  IV.  Legal Standards for Summary Judgment

21              Summary judgment is appropriate when it is demonstrated that the standard set

22  forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should be rendered

23  if . . . there is no genuine issue as to any material fact, and . . . the movant is entitled to judgment

24  as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

25  always bears the initial responsibility of informing the district court of the basis

26  for its motion, and identifying those portions of "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Federal Rule of Civil Procedure 56(c).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

　　　　　If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Anderson, 477 U.S. at 248; T.W. Elec. Serv., 809 F.2d at 631.

4

1    In the endeavor to establish the existence of a factual dispute, the opposing party

2    need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

3    claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4    versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

5    judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

6    genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e), Advisory

7    Committee's note on 1963 amendments).

8    In resolving the summary judgment motion, the court examines the pleadings,

9    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

10   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed. Anderson, 477

11   U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court

12   must be drawn in favor of the opposing party. Matsushita, 475 U.S. at 587.  Nevertheless,

13   inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

14   factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602

15   F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

16   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

17   some metaphysical doubt as to the material facts . . .  Where the record taken as a whole could

18   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

19   trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

20   On February 12, 2010, the court advised plaintiff of the requirements for opposing

21   a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 30.) See Rand

22   v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999),

23   and Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

24   V.  Undisputed and Disputed Facts

25   The following facts are deemed undisputed for purposes of the pending motion:

26   1.   Plaintiff, James Daniel Alexander, was received into CDCR's custody on

June 13, 1993.  He was released on parole on August 11, 1994, but was returned to state prison on March 12, 1996, for a term of thirty years to life under California's "Three Strikes" law.  (Dfs. Ex. A.)

2.    Defendants Barron and Wedemeyer were each employed as a correctional officer at HDSP, on May 13, 2008.  (Dfs. Ex. E.)

3.    Defendants Woodford and Dovey are each former CDCR administrators, who retired from CDCR before the challenged incident, on May 13, 2008, and hence before plaintiff's initiation of this action, on November 19, 2008.  (Dfs. Ex. B.)

The parties dispute the following matter, viz., whether defendants Barron and Wedemeyer confiscated plaintiff's magazines on May 13, 2008:

1.    Plaintiff states, "I specifically remember when Defendants Barron and Wedemeyer confiscated three of my adult, mens magazines on May 13, 2008, at High Desert State Prison."  (Pl. Ex. D, ¶ 10.)

2.    Defendants Barron and Wedemeyer each responded to plaintiff's discovery requests that neither has a "present recollection of confiscating Plaintiff's magazines."  (Dfs. Ex. E.)

VI.  Evidentiary Challenge

Defendants object to that portion of plaintiff's declaration that summarizes his discussions with other inmates, and was submitted as evidence in support of plaintiff's factual arguments.  (See Plaintiff's Decl. (Pl. Ex. D, ¶¶ 5-7) (Dkt. No. 97 at 45-46).)[1]  Defendants are correct that these statements are "inadmissible hearsay" (Dkt. No. 102 at 24),[2] by application of

////

////

_____

[1]  The pertinent portion of the declaration provides that plaintiff was told by other inmates, pursuant to "extensive conversations with numerous fellow heterosexual, male prisoners," that, "since the enactment of the regulation that prohibits possession of non-obscene materials that display female nudity," these prisoners:  (1) "have adopted homosexuality in substitution," (2) "have a tendency to 'act out' (violently and non-violently)," and (3) "fantasize about female officers more now that the materials are prohibited."  (Plaintiff's Decl. (Pl. Ex. D, ¶¶ 5-7) (Dkt. No. 97 at 45-46).)

[2]  Unless otherwise noted, references to pages contained in filed documents reflect the court's electronic pagination ("CM/ECF"), which may not coincide with the internal pagination of the document.

1    Federal Rule of Evidence 801.[3]  Accordingly, the court strikes paragraphs 5 through 7 of

2    plaintiff's declaration; the court does not consider these alleged facts, either as presented in

3    plaintiff's declaration, or in his opposition.

4    VII.   The Challenged Regulation

5              Section 3006(c)(17), title 15, California Code of Regulations, prohibits California

6    inmates from possessing non-obscene, "sexually explicit material,"[4] defined in pertinent part to

7    depict "the frontal nudity of either gender, including the exposed female breast(s) and/or the

8    genitalia of either gender." 15 C.C.R. § 3006(c)(17)(A).  Exceptions are made for "educational,

9    medical/ scientific, or artistic materials," that are "[d]epartmentally purchased or acquired," or

10   "purchased or possessed by inmates and approved by the institution head or their designee on a

11   case-by-case basis." Id., § Section 3006(c)(17)(B).  The regulation provides in full:

12              Section 3006.  Contraband.  Inmates may possess only the personal
              property, materials, supplies, items, commodities and substances,
13              up to the maximum amount, received or obtained from authorized
              sources, as permitted in these regulations.  Possession of
14              contraband as defined in section 3000 may result in disciplinary
              action and confiscation of the contraband.

15              . . . (c) Except as authorized by the institution head, inmates shall
16              not possess or have under their control any matter which contains
              or concerns any of the following:

17              . . . (17)  Sexually explicit images that depict frontal nudity in the
18              form of personal photographs, drawings, magazines, or other

19   _____

20        [3] Federal Rule of Evidence 801 provides in pertinent part:

21   (c)  "Hearsay" means a statement that:

22        (1)    the declarant does not make while testifying at the current trial or
               hearing; and
23        (2)    a party offers in evidence to prove the truth of the matter asserted
               in the statement.

24   Fed. R. Evid. 801(c).

25        [4]  This action addresses the constitutionality of California's prison ban only on "sexually
     explicit material," as set forth in Section 3006(c)(17).  This action does not encompass the prison
26   ban on "obscene material," as defined and set forth in Section 3006(c)(15).

pictorial format.

(A)  Sexually explicit material shall be defined as material that shows the frontal nudity of either gender, including the exposed female breast(s) and/or the genitalia of either gender.

(B)  The following sexually explicit material shall be allowed:

> 1. Departmentally purchased or acquired educational, medical/scientific, or artistic materials, such as books or guides purchased by the department for inclusion in institution libraries and/or educational areas; or

> 2. Educational, medical/scientific, or artistic materials, including, but not limited to, anatomy medical reference books, general practitioner reference books and/or guides, National Geographic, or artistic reference material depicting historical, modern, and/or post modern era art, purchased or possessed by inmates and approved by the institution head or their designee on a case-by-case basis.

Section 3006(c)(17), was adopted as an emergency regulation on September 30, 2002, by former CDCR Director Edward S. Alamedia.  (Dfs. Exs. C, D.)  Pursuant to the adoption process, CDCR gave notice to inmates of the proposed regulation, and an opportunity to comment.  (Dfs. Ex. D.)  CDCR received, and responded to, numerous inmate comments before adopting Section 3006(c)(17).  (Id.)  CDCR published the following reasons for enacting the regulation:

> This regulation will aid in the legitimate penological interests of maintaining the safety and security of the prisons, rehabilitating inmates, reducing sexual harassment of correctional officers and preventing a hostile work environment.  Sexually explicit materials, within the institutions, have contributed to an increase of verbal assaults and have lead to the intimidation of female correctional staff when attempting to perform cell searches. Inmates subject female correctional staff to a daily barrage of unwarranted sexual advances, thus causing an uncomfortable working environment and continued confrontation with inmates.

> Additionally, unrestricted access to sexually explicit material could lead to bartering between inmates and anatomical comparisons could lead to fights between inmates thereby jeopardizing the safety of prison staff and other inmates.

8

1      . . . The Department contends that prohibiting sexually explicit
       materials that show frontal nudity is aimed at the legitimate interest
2      of maintaining prison security, rehabilitating inmates, and reducing
       sexual harassment.  The Department also contends that reducing
3      violence and aggression toward female staff, and protecting the
       safety of departmental staff at the institutions, in general, is a
4      legitimate interest, and that reducing sexual harassment and not
       allowed a hostile work environment in particular, likewise is
5      legitimate.

6      The Department contends that inmates retain alternative means of
       exercising their constitutional right to receive sexually explicit
7      communications, since these regulations do not prohibit sexually
       explicit letters nor does it prohibit sexually explicit articles or
8      photographs of clothed persons.

9   (Dfs. Ex. D (Dkt. No. 95-4 at 7-8) ("Background Material," dated Sept. 30, 2002, filed in support

10  of § 3006(c)(17), prepared by Rick Grenz, CDCR Chief of the Regulation and Policy

11  Management Branch, Policy and Evaluation Division).)

12  VIII.  Discussion

13        A.  Statute of Limitations

14        Defendants first contend that this action is time-barred.  Defendants argue that,

15  because the challenged regulation was enacted in 2002, plaintiff's instant challenge, commenced

16  in 2008, is barred by the four-year statute of limitations applicable to prisoner civil rights cases.[5]

17        However, this action, as framed, is not subject to a statute of limitations defense.

18  "In non-taking contexts, the harm is continuing or does not occur until the statute 'is enforced,'

19  and consequently the Supreme Court has allowed non-taking challenges to statutes 'long after

20

21        [5]  Section 1983 contains no statute of limitations.  Federal courts apply the state's
    personal injury statute of limitations, subject to any state tolling provisions that are not
22  inconsistent with federal law.  Wallace v. Kato, 549 U.S. 384, 387 (2007).  Since January 1,
    2003, the California statute of limitations for personal injury actions is two years.  Cal. Code Civ.
23  Proc. § 335.1; Maldonado v. Harris, 370 F.3d 945, 954-55 (9th Cir. 2004).  In addition, the
    statute of limitations is tolled for two years for prisoners serving less than a life sentence,
24  provided the plaintiff was incarcerated at the time the claim accrued.  Cal. Code Civ. Proc.  §
    352.1(a); Johnson v. State of California, 207 F.3d 650, 654 (9th Cir. 2000); Jones v. Blanas, 393
25  F.3d 918, 928 n.5 (9th Cir. 2004) (construing provision to include prisoners serving life
    sentences with possibility of parole).  Therefore, the effective statute of limitations for a
26  prisoner's civil rights claim is four years.

9

1   they were enacted.'" <u>Carson Harbor Village Ltd. v. City of Carson</u>, 37 F.3d 468, 476 n.7 (9th Cir.

2   1994), overruled on other grounds by <u>WMX Technologies, Inc. v. Miller</u>, 104 F.3d 1133, 1136

3   (9th Cir. 1997) (quoting <u>Levald, Inc. v. City of Palm Desert</u>, 998 F.2d 680, 688 (9th Cir. 1993);

4   <u>see also</u> <u>National Advertising Co. v. City of Raleigh</u>, 947 F.2d 1158, 1168 (4th Cir. 1991) ("it is

5   doubtful that an ordinance [that may be] facially offensive to the First Amendment can be

6   insulated from challenge by a statutory limitations period"); <u>accord</u> <u>Santa Fe Springs Realty</u>

7   <u>Corp. v. City of Westminster</u>, 906 F. Supp. 1341, 1364-65 (C.D. Cal. 1995) ("A First

8   Amendment challenge . . . involves a continuing injury based upon the statute's on-going effect

9   on protected speech. . . . [S]trong policy reasons militate in favor of permitting facial challenges

10   to statutes that impinge upon protected First Amendment rights . . . ."); <u>see also</u> <u>Hargis v. Foster</u>,

11   312 F.3d 404, 410 (9th Cir. 2002) (a prisoner may challenge a state regulation on First

12   Amendment grounds, both facially and as-applied).

13          Here, plaintiff makes both a "facial challenge" to Section 3006(c)(17), and an "as-

14   applied" challenge, based on the alleged confiscation of plaintiff's magazines on May 13, 2008.

15   The statute of limitations does not preclude this court from addressing the merits of plaintiff's

16   claims under either analysis.

17        B.  <u>First Amendment Right to Freedom of Expression</u>

18          Plaintiff contends that the challenged regulation, both facially and as applied

19   against him, violates his First Amendment right to freedom of expression.  (SAC, Dkt. No. 13 at

20   6-7 (Claims 10-14).)  As set forth in the operative complaint, plaintiff alleges that the

21   regulation's "blanket" prohibition, preventing prisoners from possessing non-obscene materials

22   depicting female frontal nudity, is impermissibly "overbroad," an "exaggerated response to

23   security concerns."  (<u>Id.</u> at 6.)

24          Defendants move for summary judgment on this claim on the ground that the

25   challenged regulation is reasonably related to legitimate government objectives.

26   ////

1        1. <u>Legal Standards</u>

2        "[A] prison inmate retains those First Amendment rights that are not inconsistent

3    with his status as a prisoner or with the legitimate penological objectives of the corrections

4    system." <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974).  In <u>Turner v. Safley</u>, 482 U.S. 78 (1987),

5    the Supreme Court identified four factors to be considered in evaluating the constitutionality of a

6    prison regulation.  <u>Accord</u>, <u>Beard v. Banks</u>, 548 U.S. 521, 528-29 (2006).  As summarized by the

7    Ninth Circuit, these factors are:

8            (1)    Whether there is a valid, rational connection between the
                    prison regulation and the legitimate governmental interest
9                   put forward to justify it;

10           (2)    Whether there are alternative means of exercising the right
                    that remain open to prison inmates;
11

12           (3)    Whether accommodation of the asserted constitutional right
                    will impact . . . guards and other inmates, and . . . the
13                  allocation of prison resources generally; and

14           (4)    Whether there is an absence of ready alternatives versus the
                    existence of obvious, easy alternatives.

15   <u>Shakur v. Schriro</u>, 514 F.3d 878, 884 (9th Cir. 2008), citing <u>Turner</u>, 482 U.S. at 89-90 (additional

16   citations and internal quotation marks omitted).  These factors are to be considered in light of the

17   competing principles that exist in a prison setting, specifically, that although prisoners retain

18   some constitutional rights, the courts are ill-equipped to address matters of prison administration.

19   <u>Turner</u> at 84.  "To maintain the necessary balance between these two basic principles, [courts]

20   must apply a deferential standard of review to challenges regarding prison regulations and uphold

21   the regulation 'if it is reasonably related to legitimate penological interests.'"  <u>Mauro v. Arpaio</u>,

22   188 F.3d 1054, 1058 (9th Cir. 1999) (en banc), <u>cert. denied</u>, 529 U.S. 1018 (2000), quoting

23   <u>Turner</u>, 482 U.S. at 89.

24        In <u>Mauro v. Arpaio</u>, <u>supra</u>, 188 F.3d 1054, the Ninth Circuit Court of Appeals,

25   sitting en banc, addressed the constitutionality of a county jail policy similar to the regulation

26   challenged in the instant case.  There, an Arizona pretrial detainee challenged, on First

11

1   Amendment grounds, a county policy prohibiting jail inmates from possessing "sexually explicit

2   material." Id. at 1057.  The policy included the prohibition of "materials that show frontal

3   nudity," which encompassed "personal photographs, drawings, and magazines and pictorials that

4   show frontal nudity." Id.  In a majority opinion, the Court of Appeals affirmed the district

5   court's grant of summary judgment to defendant county, based on the following analysis.

6           Applying the first Turner factor, pursuant to the approach articulated in

7   Thornburgh v. Abbott, 490 U.S. 401, 414 (1989) (requiring that a challenged governmental

8   policy be rationally related to an objective that is both legitimate and neutral), the Ninth Circuit

9   initially found that the challenged policy was "expressly aimed at maintaining jail security,

10  rehabilitating inmates and reducing sexual harassment of female detention officers," and that

11  each of these goals was a "legitimate penological interest." Mauro, 188 F.3d at  1059 (citations

12  omitted).  The court next found that the policy was "unquestionably" neutral, id. at 1059, because

13  it "'further[ed] . . . important or substantial interest[s] unrelated to the suppression of

14  expression,'" id. (quoting Thornburgh, 490 U.S. at 415 (citation and internal quotation marks

15  omitted).)  The court then found a rational relationship between the challenged policy and the

16  county's legitimate penological objectives.  The court determined that this relationship was

17  "clear," based on actual problems within the jail prior to implementation of the policy.  The court

18  observed that, "[i]n the past, inmates have used nude photographs to draw anatomical

19  comparisons with the wives, girlfriends and mothers of other inmates, which in turn led to fights

20  and disturbances by the inmates and created a security risk for both inmates and jail employees;

21  to draw anatomical comparisons between the female detention officers and the persons depicted

22  in the photographs; and to openly masturbate in front of and otherwise sexually harass the female

23  officers." Mauro, 188 F.3d at 1060 (fn. omitted).  The court concluded that, although "the 'fit'

24  between the policy and the jail's objectives is not 'exact,' an exact fit is not required.  Rather, all

25  that is required is that there be a 'rational' connection between the policy and the jail's legitimate

26  objective.  This standard is met." Id.

Addressing the second Turner factor, alternative means for exercising the constitutional right at issue, the Ninth Circuit construed the right "'sensibly and expansively.'" Mauro, 188 F.3d at 1061 (quoting Thornburgh, 490 U.S. at 417). The court determined that "a sensible and expansive view of the constitutional right infringed by the jail's policy is the 'right to receive sexually explicit communications.'" Id. The court found, that "[v]iewed in this sensible and expansive manner, there are many alternative means available to the inmates." Id. The Court of Appeals cited with approval the district court's identification of available alternatives, and found that "although the policy bans all sexually explicit materials depicting frontal nudity, it does not ban sexually explicit letters between inmates and others, nor does it ban sexually explicit articles or photographs of clothed females." Id., citing Amatel v. Reno, 156 F.3d 192, 202 (D.C. Cir. 1998) ("[T]he regulation by its terms only restricts pictures; a prisoner may read anything he pleases.")

The Ninth Circuit next addressed the third Turner factor, the potential impact on other inmates, correctional staff, and prison resources, of accommodating the asserted constitutional right. Again noting the jail's experience prior to implementing the challenged policy, the court found that "the impact of allowing inmates unrestricted access to sexually explicit materials . . . would be significant." Mauro, 188 F.3d at 1061. The court noted that "such access could lead to the bartering of sexually explicit materials and anatomical comparisons which could in turn lead to fights between inmates. These fights jeopardize not only the safety of jail employees, but also other inmates. [¶] Moreover, [such access] . . . would expose the female detention officers . . . to sexual harassment and a hostile work environment." Id. at 1061-62.

In addressing the fourth and final Turner factor, "whether the policy is an exaggerated response to the jail's concerns," id. at 1062, the Ninth Circuit initially noted that, "[t]he burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation." Id. (citing Turner, 482 U.S. at 91;

1  O'Lone v. Estate of Shabazz, 482 U.S. 342, 350 (1987) ("placing the burden on prison officials

2  to disprove the availability of alternatives . . . fails to reflect the respect and deference that the

3  United States Constitution allows for the judgment of prison administrators."); and Casey v.

4  Lewis, 4 F.3d 1516, 1523 (9th Cir. 1993) ("It is incumbent upon the prisoners to point to an

5  alternative that accommodates their rights at de minimis cost to security interests." ).)

6          The court considered each of Mauro's suggested alternatives -- a reading room

7  where inmates could view sexually explicit materials, or psychological testing of inmates to

8  identify those "fit" to receive sexually explicit materials -- and concluded that implementation of

9  either alternative "would impose more than a de minimis cost on valid penological interests and

10  are therefore inadequate alternatives to the policy."  Mauro, 188 F.3d at 1062.  The court found

11  that implementation of Mauro's suggested alternatives "would impose a significant

12  administrative burden," and "would not address the other reasons for having the policy -- prison

13  security and sexual harassment of the female detention officers."  Id. at 1062-63.  On this basis,

14  the court concluded that the challenged policy was not an "exaggerated response" to the

15  problems it sought to remedy.

16          In conclusion, the Ninth Circuit observed:

17          We recognize that there may be a different, less restrictive means
           of achieving defendants' legitimate objectives.  Under Thornburgh,
18          however, the defendants are not required to adopt the least
           restrictive means of achieving these objectives.  Rather, the
19          defendants must simply ensure that the policy is reasonably related
           to legitimate penological interests.  Because, under the facts of this
20          case, the prohibition on sexually explicit materials fulfills this
           reasonableness test, we hold that the policy does not violate the
21          First Amendment.

22  Mauro, 188 F.3d at 1063.

23          Three months later, a Ninth Circuit panel relied on Mauro to uphold, in Frost v.

24  Symington, 197 F.3d 348 (9th Cir. 1999), a district court's grant of summary judgment to

25  defendants on an Arizona state prisoner's First Amendment challenge to a regulation banning the

26  possession of sexually explicit materials (issues of Gallery and Penthouse magazines depicting

1  penetration).

2       Five years after <u>Mauro</u> was decided, but without reference to that decision,

3  another Ninth Circuit panel held, in <u>Bahrampour v. Lampert</u>, 356 F.3d 969 (9th Cir. 2004), that

4  an Oregon regulation, prohibiting state prisoners from receiving mail containing "portrayals of

5  certain actual or similar sexual acts or behaviors," and "role-playing or similar fantasy games and

6  materials," was constitutional under <u>Turner</u>. <u>Id.</u> at 975-76.  Affirming the district court's grant of

7  summary judgment in favor of defendant prison officials with the Oregon Department of

8  Corrections ("ODC"), the Ninth Circuit rejected plaintiff's claims of vagueness and over-breadth,

9  and ruled in pertinent part that "[a]ll four of the <u>Turner</u> factors weigh in favor of ODC.  Mr.

10  Bahrampour has not demonstrated that the regulations are irrational or unreasonable, or that there

11  are alternative solutions that are easy, obvious, and of 'de minimis cost to valid penological

12  interests.'" <u>Bahrampour</u>, 356 F.3d at 976 (quoting <u>Turner</u>, 482 U.S. at 90-91).

13       Subsequently, in several unpublished decisions, the Ninth Circuit relied on

14  <u>Mauro</u> and <u>Bahrampour</u> to reject prisoners' First Amendment challenges to bans on possessing

15  sexually explicit materials.  The most relevant of these decisions is <u>Nelson v. Woodford</u>, 249

16  Fed. Appx. 529 (9th Cir. 2007), wherein the Ninth Circuit affirmed a district court's grant of

17  summary judgment to defendants, in a challenge to the constitutionality of Sections 3006(c)(15)[6]

18  and (17), title 15, California Code of Regulations.  Plaintiff had challenged the denial of his

19  access to issues of Esquire magazine that contained depictions of frontal nudity.  The Ninth

20  Circuit found that, "[t]he district court properly concluded that the regulations prohibiting

21  Nelson's possession of obscene or sexually explicit material, 15 Cal. Code Reg. §§ 3006(c)(15)

22  & (17), respectively, are constitutional because the regulations' underlying policies are

23  reasonably related to legitimate penological interests." <u>Nelson</u>, <u>supra</u>, at *1.  <u>Accord</u>, <u>Crozier v.</u>

24  

25     [6] As previously noted (<u>see</u> n.4, <u>supra</u>), Section 3006 (c)(15) prohibits a prisoner's
possession of "obscene" material (as compared to the prohibition of "sexually explicit" material
26  under Section 3006(c)(17)).

1 | <u>Endel</u>, 2011 WL 3098831, *1 (9th Cir. 2011) (affirming district court's dismissal of a Nevada

2 | state prisoner's First Amendment challenge to a ban of his subscription to an erotic magazine,

3 | because the ban "was reasonably related to legitimate penological interests"); <u>Jost v. Lockyer</u>,

4 | 127 Fed. Appx. 358 (9th Cir. 2005) (upholding, upon screening under 28 U.S.C. § 1915A,

5 | dismissal of prisoner's First Amendment challenge to the withholding of a book containing full

6 | frontal nudity); <u>Munro v. Tristan</u>, 116 Fed. Appx. 820, 821 (9th Cir. 2004) (upholding, upon

7 | screening under 28 U.S.C. § 1915A, dismissal of prisoner's First Amendment challenge to the

8 | withholding  of "sexually explicit materials containing frontal nudity").

9 |        2. <u>Discussion</u>

10 |        The California regulation challenged by plaintiff in the instant case, Section

11 | 3006(c)(17), is similar to the county policy upheld in <u>Mauro</u>.  <u>See</u> <u>Zarate v. Tilton</u>, 2009 WL

12 | 311401, *5 (N.D. Cal. 2009) ("the CDCR policy does not materially differ from the policy

13 | upheld in <u>Mauro</u>").  Moreover, plaintiff's First Amendment challenges to Section 3006(c)(17),

14 | are very similar to those addressed in <u>Mauro</u>.[7]  Nevertheless, the court considers plaintiff's

15 | arguments under each of the <u>Turner</u> factors.

16 |       a. <u>Rational Relationship to Legitimate Penological Objectives</u>

17 |       CDCR's stated reasons for implementing Section 3006(c)(17), set forth above,

18 | include the following:  "maintaining the safety and security of the prisons, rehabilitating inmates,

19 | reducing sexual harassment of correctional officers and preventing a hostile work environment."

20 | (Dfs. Ex. D (Dkt. No. 95-4 at 8).)  In <u>Mauro</u>, the Ninth Circuit found these objectives both

21 | legitimate and rationally related to a similar ban on sexually explicit materials depicting frontal

22 | nudity.  <u>Mauro</u>, 188 F.3d at 1059-60.

23 |       Notwithstanding <u>Mauro</u>, plaintiff challenges CDCR's stated objectives.  Plaintiff

24 |

25 |    [7] Plaintiff's First Amendment challenge to Section 3006(c)(17), includes some of the matters addressed in the Ninth Circuit's dissenting opinion filed in <u>Mauro</u>.  <u>See</u> <u>Mauro v. Arpaio</u>, 188 F.3d at 1063-72.  However, this court is required to apply the principles and rulings

26 | articulated in the court's majority holding.

1   initially argues that "defendants have not produced a well-supported judgment, based on factual

2   evidence, that there is a rational connection between the regulation and the [asserted] legitimate

3   penological interest[s]." (Dkt. No. 97 at 9.)  Plaintiff has submitted evidence which he asserts

4   demonstrates an increase in violent prison incidents since implementation of the regulation in

5   2002, despite "the overall prison population remain[ing] the same." (Id. at 6.)  Plaintiff contends

6   that this increase "can be attributed to an elevated number of sexually frustrated inmates, who are

7   no longer able to release aggressions through the benefits of non-obscene materials that display

8   female nudity." (Id.)  Plaintiff has also submitted evidence of CDCR recidivism rates, which he

9   asserts demonstrates that the challenged "regulation has had no appreciable effect or influence on

10  the rehabilitation of prisoners." (Id. at 7.)

11          The court finds that, while plaintiff's statistical data generally supports plaintiff's

12  assertion that there has been an increase in incidents of inmate violence despite a relatively stable

13  inmate population,[8] plaintiff's explanation lacks evidentiary support.  Plaintiff's explanation is

14  _____

15       [8]  Plaintiff submitted the following evidence:  (1) CDCR graphs and tables, published in
    September 2007, that sets forth the numbers and rates of "inmate incidents," from 1996 through
16  2006, including violent incidents identified by type, date and location (Pl. Ex. A (Dkt. No. 97 at
    29-36)); and (2) a chart and table showing institutional populations from 1989 to 2008 (Pl. Ex. B
17  (Dkt. No. 97 at 37-39)).

18       The total rate of all "inmate incidents," based on an average daily population of 100, was
    7.8 in 2002, 8.0 in 2003, 7.9 in 204, 8.7 in 2005, and 9.2 in 2006 (Pl. Ex. A (Dkt. No. 97 at 31)),
19  thus generally supporting plaintiff's assertion that there has been an increase since the enactment
    of Section 3006(c)(17) of "inmate incidents" that include incidents of violence.  However, an
20  inherent problem with this information is that total numbers and rates reflect a compilation of
    related and unrelated "incidents," including violence against others, suicide and suicide attempts,
21  and possession of controlled substances.  The most relevant assessment is provided in the
    introduction to the "total incident" tables, which provides in pertinent part (id. at 30):
22
        The number of incidents increased by 804[,] from 13,686 in 2005[,] to 14,490 in
23      2006.  The largest increase was with assault and battery without weapon incidents.
        Physical assaults without weapon on an inmate seemed to present the largest
24      increase for incidents. . . . [However,] [i]n 2006, the increase in the number of
        incidents could possibly be related to the increase in the institutions and camps
25      population.

26       Plaintiff's second exhibit sets forth total inmate populations for the years 1989 to 2008.

1   premised primarily on a portion of his declaration stricken by the court as inadmissible hearsay

2   (see n.1, supra, and related text), specifically, that other prisoners told plaintiff that enactment of

3   the challenged regulation has caused them "sexual frustrations" resulting in "a tendency to 'act

4   out' (violently and non-violently)." (Plaintiff's Decl. (Pl. Ex. D, ¶6) (Dkt. No. 97 at 45).)  The

5   only other evidence in support of plaintiff's explanation is his own sworn statement that his own

6   "sexual frustrations," allegedly attributable to enforcement of the challenged regulation, causes

7   plaintiff "difficulty with controlling a placid temperament whe[n] I feel agitated." (Id., ¶ 3.)

8   These statements, even if taken together, fail to provide reliable evidentiary support for plaintiff's

9   assertion that enforcement of the challenged regulation has caused increased inmate violence.

10            Similar problems beset plaintiff's assertion that CDCR recidivism rates

11  demonstrate that the challenged regulation hasn't had a rehabilitative impact.  (Id. at 7.)  The

12  evidence submitted by plaintiff -- two charts depicting the number of "felon parole violators"

13  from 1989 through 2008, and a table identifying the "principal commitment offense" of

14  recidivists in 2006 (Pl. Ex. C (Dkt. No. 97 at 40-43)) -- does not demonstrate, or support a

15  reasonable inference, that Section 3006(c)(17) is a material factor in recidivism.

16            Therefore, the court finds that plaintiff has submitted no relevant and admissible

17  factual evidence in support of his theory that the prison ban on inmate possession of sexually

18  explicit materials has resulted in an increase in inmate violence or recidivism.  Plaintiff does not

19  expressly attempt to refute, in this context, CDCR's other stated objectives of the challenged

20  regulation, viz., rehabilitation, and the reduction of sexual harassment against female correctional

21  officers.[9]

22            Absent evidence sufficient to refute CDCR's "common sense" justifications for

23  

24  The most helpful assessment is the change in population, by percentage, measured on December
    31 of the following years:  2002 (+1.6 %); 2003 (+1.3 %); 2004 (+1.3 %); 2005 (+2.4 %); 2006
    (+2.6 %); 2007 (-0.6 %); 2008 (-0.2 %).  (Pl. Ex. B (Dkt. No. 97 at 39).)

25  

26      [9]  The court rejects plaintiff's challenges to these further goals, which he has raised in
    other contexts, for the reasons stated elsewhere in these findings and recommendations.

1   implementing and enforcing Section 3006(c)(17), see Frost v. Symington, supra, 197 F.3d at 357

2   (citing Mauro, 188 F. 3d at 1060), "the government [is] not required to make any evidentiary

3   showing concerning the connection," Frost, 197 F. 3d at 357 (explaining respective burdens of

4   proof).[10]  Thus, plaintiff's contention that defendants failed to submit factual evidence to support

5   their assertion of a rational relationship between the Section 3006(c)(17), and its stated

6   objections, is without merit.

7            Plaintiff next contends that Section 3006(c)(17), is patently not "content neutral,"

8   because it expressly bans sexually explicit materials.  However, as the Ninth Circuit noted in

9   Mauro, the test of "neutrality" is whether the challenged regulation "'further[s] an important or

10  substantial governmental interest unrelated to the suppression of expression.'"  Mauro, 188 F. 3d

11  at 1059, quoting Thornburgh, 490 U.S. at 415 (citation and internal quotation marks omitted).

12  So construed, and based on the objectives previously identified, this court finds that Section

13  3006(c)(17) satisfies the Turner/Thornburgh "content neutral" requirement.  Accord, Frost, 197

14  F. 3d at 357 ("the same analysis holding the Mauro policy to be neutral applies here") (citing

15  Mauro, 188 F.3d at 1061).

16           Therefore, this court finds that Section 3006(c)(17), is rationally related to

17  CDCR's legitimate penological objections, and thus satisfies the first prong of the Turner

18  _____

19        [10]  In explaining the evidentiary burden that prison officials must meet in order to satisfy
    the first Turner prong, the Ninth Circuit stated in pertinent part:

20        When the inmate presents sufficient (pre or post) trial evidence that refutes a
          common-sense connection between a legitimate objective and a prison regulation,
21        Walker [v. Sumner, 917 F.2d 382 (9th Cir. 1990)] applies, and the state must
          present enough counter- evidence to show that the connection is not so "remote as
22        to render the policy arbitrary or irrational."  Mauro, 188 F.3d at 1060 (quoting
          Turner, 482 U.S. at 89-90, and Amatel, 156 F.3d at 200-01).  On the other hand,
23        when the inmate does not present enough evidence to refute a common-sense
          connection between a prison regulation and the objective that government's
24        counsel argues the policy was designed to further, Mauro applies and, presuming
          the governmental objective is legitimate and neutral, see Thornburgh, 490 U.S. at
25        414, Turner's first prong is satisfied.

26  Frost v. Symington, supra, 197 F.3d at 357.

1 analysis.

2            b. <u>Alternative Means of Exercising Asserted Right</u>

3           Plaintiff contends that he has no alternative means of exercising his asserted right

4 to possess sexually explicit materials depicting female nudity.  However, in assessing plaintiff's

5 claim pursuant to <u>Turner</u>'s second factor, the asserted constitutional right must be viewed

6 "sensibly and expansively."  <u>Mauro</u>, 188 F.3d at 1061 (citation and internal quotation marks

7 omitted).  In <u>Mauro</u>, the Ninth Circuit broadly construed the asserted right as the "right to receive

8 sexually explicit communications."  <u>Id.</u>  Although the policy at issue in <u>Mauro</u> provided no

9 express alternatives, the Court of Appeals adopted the district court's identification of available

10 alternatives, specifically, the perusal of sexually explicit written materials and photographs of

11 clothed women.  <u>See Mauro</u>, 188 F.3d at 1061.  Based on these alternative means for Mauro to

12 exercise his First Amendment rights, the Ninth Circuit found that the second <u>Turner</u> factor was

13 met.

14           In contrast to the policy in <u>Mauro</u>, Section 3006(c)(17) expressly provides

15 alternative means for prisoners to view and possess sexually explicit materials.  Section

16 3006(c)(17) authorizes the possession of sexually explicit "educational, medical/scientific, or

17 artistic materials," subject to approval on a case-by-case basis.  Section 3006(c)(17)(B)(2).  The

18 regulation also provides for the viewing of sexually explicit "educational, medical/scientific, or

19 artistic materials," in institutional libraries and education areas.  Section 3006(c)(17)(B)(1).

20 As CDCR itself noted, apparently in reliance on <u>Mauro</u>, "inmates [also] retain alternative means

21 of exercising their constitutional right to receive sexually explicit communications, since these

22 regulations do not prohibit sexually explicit letters nor does it prohibit sexually explicit articles

23 or photographs of clothed persons."  (Dfs. Ex. D (Dkt. No. 95-4 at 8).)  The court finds that these

24 several options accord plaintiff reasonable alternative means for exercising his asserted

25 constitutional right.  <u>Accord</u>, <u>Frost</u>, 197 F.3d at 357 ("[i]ndeed, the regulation at issue here gives

26 prisoners access to a larger universe of materials than the regulation that was upheld in <u>Mauro</u>").

1     Therefore, the court finds that Section 3006(c)(17), satisfies the second prong of

2  the Turner analysis.

3          c.  Reasonable Accommodation

4     The third Turner factor requires an assessment of the potential consequences, to

5  other inmates and to prison staff and resources, if the asserted right was implemented.  "When

6  accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on

7  prison staff, courts should be particularly deferential to the informed discretion of corrections

8  officials."  Turner, 482 U.S. at 90.  In Mauro, implementation of the challenged jail policy,

9  (materially the same as the regulation challenged here, Zarate v. Tilton, supra, 2009 WL 311401,

10 *5), resulted in a tangible "sharp decrease in the number of problems encountered by the female

11 officers."  Mauro, 188 F.3d at 1057.  Thus, the Ninth Circuit found that revocation of the policy

12 could lead to a return "to sexual harassment and a hostile work environment," as well as

13 "bartering of sexually explicit materials and anatomical comparisons which could in turn lead to

14 fights between inmates. . . .[that would] jeopardize not only the safety of jail employees, but also

15 other inmates"  Id. at 1061-62.  Pursuant to these considerations, the Ninth Circuit concluded that

16 the Arizona policy satisfied the third Turner prong.

17     Similarly, in the present case, upon enacting Section 3006(c)(17), CDCR noted

18 that, previously, "[s]exually explicit materials, within the institutions, have contributed to an

19 increase of verbal assaults and have lead to the intimidation of female correctional staff when

20 attempting to perform cell searches.  Inmates subject female correctional staff to a daily barrage

21 of unwarranted sexual advances, thus causing an uncomfortable working environment and

22 continued confrontation with inmates."  (Dfs. Ex. D (Dkt. No. 95-4 at 8).)

23     While plaintiff contends that CDCR has failed to present sufficient evidence to

24 support its assessment of potential consequences if the asserted right was implemented (see

25 generally Dkt. No. 97 at 10-12), plaintiff has presented no evidence (or, for that matter, any

26 argument) that raises a reasonable inference to the contrary.  See Frost, supra, 197 F.3d at 357.

1   As a result, this court finds that there are no reasonable accommodations that would facilitate the

2   implementation of plaintiff's asserted right, without undue and negative impacts on correctional

3   staff and resources, and among prison inmates.

4           Therefore, the court finds that Section 3006(c)(17), satisfies the third prong of the

5   Turner analysis.

6           d.  Readily Available Alternatives

7           Pursuant to the fourth Turner factor, the burden is on plaintiff to demonstrate that

8   there is an "obvious, easy alternative" to the challenged regulation and, therefore, that the current

9   regulation is an "exaggerated response" to defendants' concerns.  Turner, 482 U.S. at 90; Mauro,

10  188 F.3d at 1062.

11          Plaintiff suggests the following alternative to Section 3006(c)(17) (Dkt. No. 97 at

12  12):

13          A reasonable alternative solution would be to allow prisoners to
            possess the non-obscene materials, but restrict prisoners from
14          openly displaying the materials in full view of female staff.  The
            regulation should require that all depictions of female nudity be
15          secured in inmate purchased holders (photo albums, folders, large
            envelopes, etc.) at all times.  Violation of the regulation would
16          result in disciplinary action (under "sexual harassment") and could
            lead to criminal prosecution if it is determined that the harassment
17          was intentional or wanton.

18          Defendants respond that implementation of plaintiff's proposal would create a

19  hostile work environment for female correctional officers.  Defendants explain (Dkt. No. 102 at

20  17-18):

21          [I]t is the use of depictions of frontal nudity by inmates that lead to
            the adoption of the regulation.  The Department of Corrections and
22          Rehabilitation (CDCR) has always had a regulation that prohibits
            inmates from openly displaying disrespect toward staff.  Cal. Code
23          Regs. tit. 15 § 3004(b).  This is the regulation that is used when
            inmates sexually harass staff.  The ban on frontal nudity was
24          adopted because that regulation was unsuccessful in preventing
            inmate from using sexually explicit materials to sexually harass
25          female staff by displaying it and making lewd remarks.  There is no
            reason to believe that a regulation requiring inmates to keep their
26          sexually explicit materials concealed in envelopes would be any

22

more successful in preventing sexual harassment than section 3004(b) of title 15 was.  Allowing inmates to posses sexually explicit materials gives them the opportunity to use it to sexually harass staff, an[] opportunity that was frequently exploited. . . . As an employer, CDCR has a legal obligation to take action to prevent sexual harassment in the workplace because it is considered to be a form of sexual discrimination.  [Citations omitted.]  Taking action to reduce the frequency of incidents of sexual harassment of female staff is not reverse discrimination, it is CDCR's legal obligation.

The court finds defendants' explanation -- that the challenged regulation was expressly implemented to stop the sexual harassment of female correctional officers that occurred prior to its implementation -- a persuasive reason for rejecting plaintiff's suggested alternative.  CDCR's past experience supports the reasonable inference that implementation of plaintiff's proposal would again result in increased instances of sexual harassment of female correctional officers.  Moreover, as plaintiff acknowledges, implementation of his proposal would necessitate some form of punishment (plaintiff suggests "criminal prosecution") against inmates who engage in "intentional or wanton" harassment.  Even if an enforceable distinction could be made between "intentional" and "unintentional" harassment, within the prison working environment, this approach would require the allocation of limited resources to yet another disciplinary process, which this courts finds to be a "significant administrative burden," Mauro, 188 F.3d at 1062.  In addition, plaintiff's proposal "does not address the potential for such material to be passed among inmates," Frost, supra, 197 F.3d at 358, or the potentially resulting complications of enforcement.  "[F]orcing prison officials to wait until after violations have occurred before restricting inmates' access to these materials would unduly tie the hands of prison officials who see the need for preventive measures."  Id.

For these reasons, the court finds that plaintiff's proposal is neither practical nor readily achievable and, therefore, that Section 3006(c)(17) is not an "exaggerated response" to defendants' legitimate concerns.  The court finds that plaintiff has not met his burden of demonstrating an "obvious, easy alternative" to Section 3006(c)(17).  The importance of preventing sexual harassment within the prison workplace, and  of maintaining prison security

23

1    within existing practical and fiscal constraints, renders plaintiff's proposal an inadequate

2    alternative under Turner.

3            Therefore, the court finds that Section 3006(c)(17), satisfies the fourth and final

4    prong of the Turner analysis.

5                    e.  No Violation of Plaintiff's First Amendment Right to Expression

6            Pursuant to the foregoing application of the Turner analysis to the facts of this

7    case, the undersigned concludes that the ban on possession of sexually explicit materials by

8    California prisoners, as set forth in Section 3006(c)(17), title 15, California Code of Regulations,

9    does not violate plaintiff's First Amendment right to freedom of expression, either facially or as-

10   applied to plaintiff on May 13, 2008.  Accord, Nelson v. Woodford, supra, 249 Fed. Appx. at 530

11   (upholding constitutionality of Sections 3006(c)(15), and (17), based on Mauro, and an

12   independent Turner analysis, against plaintiff's First Amendment claim that he was improperly

13   denied magazines depicting frontal nudity); see also Miskam v. McAllister, 2011 WL 1549339,

14   *8-9 (E.D. Cal. 2011) (same, in response to plaintiff's First Amendment claim that he was

15   improperly denied access to a sexually-explicit comic book); Ashker v. Schwarzenegger, 2009

16   WL 801557, *11 (N.D. Cal. 2009) (finding Section 3006(c)(17) constitutional, both facially and

17   as-applied, based on Mauro, and an independent Turner analysis, in response to plaintiff's First

18   Amendment claim that he was improperly denied access to magazines containing frontal nudity);

19   Self v. Horel, 2008 WL 5048392 (N.D. Cal. 2008) (finding Section 3006(c)(17) constitutional,

20   both facially and as-applied, based on Mauro, and an independent Turner analysis, in response to

21   plaintiff's First Amendment claim that prison officials improperly denied him access to a book

22   that contained depictions of frontal nudity, including female breasts, the male and female

23   genitalia); cf. Zarate v. Tilton, supra, 2009 WL 311401, *5 (N.D. Cal. 2009) (dismissing, without

24   an independent analysis, plaintiff's First Amendment claim challenging "the policy banning him

25   from receiving magazines displaying nudity," based on Mauro and other, unpublished, Ninth

26   Circuit decisions that found the policy constitutional); but see James v. Ryan, 436 Fed. Appx.

1  804, *1 (9th Cir. 2011) (vacating dismissal of plaintiff's claim that a "prison policy bann[ing]

2  sexually explicit publications and all nudity in publications and photos," because "[w]e are

3  unable to say at this early stage of the proceeding that [plaintiff] cannot state a claim for a First

4  Amendment violation").

5      C.  First Amendment's Proscription Against the Establishment of Religion

6          Plaintiff contends that Section 3006(c)(17) "promotes religion and religious

7  beliefs/mores, and CDCR (a state agency) is prohibited from enacting/enforcing such policies,

8  where it violates the 1st Amendment, Establishment clause guarantee of 'separation of church

9  and state.'"  (Dkt. No. 13 at 7 (SAC, Claim 18).)  In his opposition, plaintiff clarifies his claim:

10  "[T]he CDCR regulation, at its core, is rooted in the puritanical belief that nudity is corrupting,

11  immoral, and shameful.  Therefore, the regulation advances religious beliefs [identified as

12  Puritanical, and Judeo-Christian, including Islamic] and fosters an excessive entanglement with

13  religion."  (Dkt. No. 97 at 15.)

14          "The Establishment Clause, unlike the Free Exercise Clause, does not depend

15  upon any showing of direct governmental compulsion and is violated by the enactment of laws

16  which establish an official religion[.]"  Engel v. Vitale, 370 U.S. 421, 430 (1962).  While the

17  Supreme Court has emphasized that the "line between permissible relationships and those barred

18  by the [Establishment] Clause" depend upon the facts of each case, that is, that the "Clause erects

19  a 'blurred, indistinct, and variable barrier depending on all the circumstances of a particular

20  relationship.'"  Lynch v. Donnelly, 465 U.S. 668, 678-679, quoting Lemon v. Kurtzman, 403 U.S.

21  602, 614 (1971).  Nevertheless, we are guided by the Court's observation that, "[i]n the

22  line-drawing process we have often found it useful to inquire whether the challenged law or

23  conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit

24  religion, and whether it creates an excessive entanglement of government with religion."  Lynch,

25  465 U.S. at 679, citing Lemon, 403 U.S. at 613.

26          In the present case, CDCR's express objectives in enacting and enforcing the

1  challenged regulation are secular.  To the extent that the regulation promotes goals that may also

2  be consistent with religious beliefs (e.g., respect, nonviolence), such impact neither advances one

3  religion over another, nor establishes a religion.  Therefore, the court finds that Section

4  3006(c)(17) does not violate the First Amendment's Establishment Clause.

5        D.  Fourth Amendment Proscription Against Unreasonable Seizures

6             Plaintiff claims that defendants' seizure and withholding from plaintiff, of

7  materials depicting female frontal nudity, violates his Fourth Amendment right to engage in

8  private sexual activity in the manner he so chooses.  (Dkt. No. 13 at 7 (SAC, Claim 19).)  In his

9  opposition, plaintiff explains that he seeks to protect his alleged "right of privacy . . . to engage in

10  heterosexual activities that are not inconsistent with his incarcerated status. . . .[specifically,]

11  heterosexual activity of sexual, self-gratification by way of viewing (in the privacy of the cell)

12  the non-obscene materials that display female nudity."  (Dkt. No. 97 at 16.)  Plaintiff contends

13  that California Penal Code section 2601(c)(1)(A), "explicitly grants prisoners the right to possess

14  [depictions of ] non-obscene female nudity."  (Dkt. No. 97 at 16.)  Plaintiff  further contends that

15  the decision in Doe v. Duling, 603 F. Supp. 960, 966 (E.D. Va. 1985), supports his contention

16  that the Fourth Amendment protects his right to control his own private sexual activity.  Finally,

17  plaintiff asserts that enforcement of the challenged regulation "is homosexual in nature," causing

18  prisoners to turn to homosexuality.

19             The district court decision in Doe v. Duling, supra, 603 F. Supp. 960, is unhelpful

20  to plaintiff.  Not only was the decision vacated on appeal in Doe v. Duling, 782 F.2d 1202 (4th

21  Cir. 1986), but the appellate decision is irrelevant to the present action.  Doe was an action filed

22  by unincarcerated, unmarried adults, who challenged the constitutionality of state cohabitation

23  statutes; the Court of Appeals held that the action failed to present a case or controversy suitable

24  for federal jurisdiction.

25             Plaintiff's contention premised on California Penal Code section 2601 is also

26  without merit.  Section 2601 sets forth a list of civil rights that state prisoners retain.  Subsection

1  (c)(1)(A), authorizes prison officials to withhold from prisoners any "[o]bscene publications or

2  writings, and mail containing information concerning where, how, or from whom this matter may

3  be obtained." Cal. Pen. Code § 2601(c)(1)(A).  The statute also authorizes the withholding of

4  "[a]ny matter of a character tending to incite . . . any . . . form of violence."  Id., § 2601(c)(1)(B).

5        In Snow v. Woodford, 128 Cal. App. 4th 383 (4th. Dist. 2005), a California

6  appellate court expressly rejected the claim that the ban on sexually explicit material set forth in

7  Section 3006(c)(17), violates California Penal Code section 2601(c)(1)(A).  The court held that

8  the challenged ban comes within the exception of California Penal Code section 2601(c)(1)(B)

9  (authorizing the withholding of materials that may incite violence).  The California appellate

10  court reasoned:

11             [P]rison authorities could ban the same writings under Penal Code
             section 2601, subdivision (c)(1)(B) if they found such writings
12             might have a tendency to incite violent situations.  Here, among the
             reasons [the] Department enacted the regulation are the prevention
13             of the intimidation and sexual harassment of female correctional
             officers by inmates and the prevention of violence between inmates
14             based on anatomical comparisons.  These reasons fall squarely
             under the Penal Code section 2601, subdivision (c)(1)(B)
15             exception.  Accordingly, the regulation [Section 3006(c)(17)] does
             not violate Penal Code section 2601.
16

17  Snow, supra, 128 Cal. App. 4th at 394; accord Ashker v. Schwarzenegger, supra, 2009 WL

18  801557, *11 (N.D. Cal. 2009) ("CCR § 2006 was enacted to prevent conditions which tend to

19  incite riot or violence and, thus, does not violate Penal Code § 2601").

20        The state has accorded prisoners no retention of civil rights related to sexual

21  activity.  While California prisoners retain the right to marry,  see Cal. Penal Code § 2601(e),

22  they have no right to consummate the marriage, see e.g. Gerber v. Hickman, 291 F.3d 617, 621

23  (9th Cir. 2002) ("The loss of the right to intimate association is simply part and parcel of being

24  imprisoned for conviction of a crime.").  Even if private sexual activity was authorized in prisons

25  (e.g., sub silentio), plaintiff seeks more pursuant to this action -- plaintiff seeks authorization to

26  ////

pursue this activity in a particular manner.  (See Plaintiff's Declaration, ¶¶ 2-4.)[11]  There is no basis for according constitutional imprimatur to such an individualized request.

Plaintiff's challenge to Section 3006(c)(17), based on the assertion that it promotes homosexual activity by repressing heterosexual expression,[12] is also unhelpful. There are broad safeguards in place to protect plaintiff's physical safety, regardless of the nature of potential assaults.  Prison officials are required to "'take reasonable measures to guarantee the safety of prisoners.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994), quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).  "In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners."  Farmer, 511 U.S. at 833.  Thus, plaintiff has asserted no cognizable basis for finding Section 3006(c)(17) in violation of the Fourth Amendment.

////

---

[11]  Plaintiff states in pertinent part:

The only means by which I can relieve innate . . . sexual urges is through self-gratification (in privacy), while viewing non-obscene materials that display female nudity -- which are in my personal possession.

When I am unable to relieve my innate . . . sexual urges, I become sexually frustrated and have difficulty with controlling a placid temperament whe[n] I feel agitated.

When I am unable to relieve my innate . . . sexual urges, I experience migraine headaches, loss of sleep, high blood pressure, and severe anxiety.

(Plaintiff's Declaration, ¶¶ 2-4 (Dkt. No. 97, Ex. D).)

[12]  Plaintiff states in pertinent part:

I have endured sexual advances from "neo-homosexuals," who have adopted homosexuality since the enactment of the regulation that prohibits possession of non-obscene materials that display female nudity.

As more time has elapsed since the enactment of the said regulation, the sexual advances by neo-homosexuals have been culminating into more aggressive advances toward me.

(Plaintiff's Declaration, ¶¶ 8, 9 (Dkt. No. 97, Ex. D).)

1    As a result, a prisoner's possession of materials disallowed under the regulation

2    renders the materials "contraband," subject to official confiscation.  See generally Section 3006,

3    tit. 15, Cal. Code Regs. ("Inmates may possess only the personal property . . . as permitted in this

4    regulations.  Possession of contraband . . . may result in disciplinary action and confiscation of

5    the contraband."). This result reflects the Supreme Court's holding that "prisoners have no

6    legitimate expectation of privacy and that the Fourth Amendment's prohibition on unreasonable

7    searches does not apply in prison cells."  Hudson v. Palmer, supra, 468 U.S. at 530.  The Court

8    observed:

9           A right of privacy in traditional Fourth Amendment terms is
            fundamentally incompatible with the close and continual
10          surveillance of inmates and their cells required to ensure
            institutional security and internal order.  We are satisfied that
11          society would insist that the prisoner's expectation of privacy
            always yield to what must be considered the paramount interest in
12          institutional security. We believe that it is accepted by our society
            that loss of freedom of choice and privacy are inherent incidents of
13          confinement.

14   Hudson , 468 U.S. at 527-28 (fn., citation and internal quotation marks omitted).

15          For these several reasons, the court finds that Section 3006(c)(17) does not

16   contravene the Fourth Amendment.

17       E.  Eighth Amendment's Proscription Against Cruel and Unusual Punishment

18          Plaintiff contends that enforcement of the challenged regulation violates his

19   Eighth Amendment right to be free from cruel and usual punishment.  As set forth in the

20   operative complaint, plaintiff alleges:

21          [P]rohibiting prisoners from viewing and possessing any and all
            materials -- that are not obscene, but that display female nudity -- is
22          in violation of the 8th Amendment protection from cruel and usual
            punishment, where it constitutes an atypical and significant
23          hardship on [male] heterosexual prisoners in relation to the
            ordinary incidents of prison life, because "extreme" cases of sexual
24          repression have surfaced as a result of the policy.  (The [e]ffects of
            the sexual repression are causing heterosexual prisoners to adopt
25          alternative, perverse, and prurient sexual release -- homosexuality,
            sexual harassment of female guards, etc.)

26

1   (Dkt. No. 13 at 7 (SAC, Claim 15).)  In his opposition to the motion for summary judgment,

2   plaintiff elaborates that, "[i]t is apparent that the regulation's only intention is to 'punish'

3   heterosexual male prisoners by preventing such prisoners from relieving innate, sexual urges,

4   through sexual self-gratification, in the privacy of their cell.  It is obvious that the regulation was

5   implemented merely as 'punishment,' because it is common knowledge that heterosexual males,

6   predominately, take pleasure (literally and figuratively) in viewing non-obscene female nudity in

7   privacy." (Dkt. No.  97 at 10.)  Plaintiff also asserts that enforcement of the regulation creates

8   "neo-homosexuals" who will victimize other inmates.  (Id. at 21.)  Plaintiff explains, "[t]he

9   defendants' act of enforcing the regulation must be considered 'deliberate indifference,' where it

10  is common knowledge that humans are 'sexual' by nature and that the repression/suppression

11  inflicted by the regulation . . . would cause numerous male prisoners to adopt homosexuality to

12  release innate, pressurized sexual urges." (Id.)

13          The Eighth Amendment's proscription against cruel and unusual punishment

14  imposes duties on prison officials to "provide humane conditions of confinement."  Farmer v.

15  Brennan, 511 U.S. at 832 (citation omitted).  These conditions must include "adequate food,

16  clothing, shelter, and medical care, and . . . reasonable measures to guarantee the safety of the

17  inmates."  Id. (citation and internal quotation marks omitted).  To establish a violation of the

18  Eighth Amendment, a prisoner must show that, objectively, he is, or was, deprived of something

19  "sufficiently serious."  A deprivation is "sufficiently serious" when a prison official's act or

20  omission results "in the denial of the minimal civilized measure of life's necessities."  The

21  prisoner must also show that the deprivation occurred as a result of deliberate indifference to the

22  inmate's health or safety; this determination is premised on an assessment of the prison official's

23  subjective state of mind.  Id. at 834 (citations and internal quotation marks omitted).

24          Plaintiff does not direct the court, and the court has not found, any authority for

25  finding that viewing or possessing sexually explicit materials is one of "life's necessities."

26  Farmer, 511 U.S. at 834.  Despite plaintiff's assertions to the contrary, the activity has not been

equated, by any identified legal authority, to the necessities of food, clothing, shelter, medical care, or safety. Thus, plaintiff's claim fails to satisfy the threshold prong of an Eighth Amendment challenge.

As a result, even if the challenged ban was construed as "punishment," it passes constitutional muster. In Mauro, the Ninth Circuit found that plaintiff had waived any Eighth Amendment challenge to Section 3006(c)(17), because he didn't raise it. Mauro, supra, 188 F.3d at 1059 n2. The dissenting justices in Mauro disagreed with the majority's failure to address the matter, because plaintiff was a pretrial detainee. As framed by Justice Kleinfeld, "[t]here is evidence in the record that the reason why the jail excludes publications with frontal nudity is to punish the prisoners. If so, the ban is unconstitutional. Under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt . . . ." Mauro, 188 F.3d at 1067 However, Justice Kleinfeld noted that punishment was a legitimate objective in the incarceration of convicted felons. "[P]risons . . .impose punishment upon people who have been convicted of crimes." Id. Thus, even assuming that an unstated purpose or effect of Section 3006(c)(17) is "punishment," the claim is not actionable.

Therefore, the court finds that Section 3006(c)(17) is not unconstitutional under the Eighth Amendment's proscription against cruel and unusual punishment.

F. Fourteenth Amendment Right to Equal Protection

Finally, plaintiff contends that the Section 3006(c)(17) promotes a policy of "gender discrimination against heterosexual, male prisoners, [because] it espouses beliefs commonly propounded by females and was originally enacted by a female director ([defendant] Jeanne Woodford) and is currently maintained by a female director ([defendant] J. Dovey), and gender discrimination is prohibited under the 14th Amendment, equal protection clause."[13] (Dkt.

---

[13] Defendants note that defendant Dovey is, in fact, a male (Dkt. No. 95 at 8 n.1), and that both administrative defendants retired from CDCR prior to the May 2008 incident that underlies this cause of action (Dkt. No. 95-1 at 2). There is no evidence in the record that either

No. 13 at 7 (SAC, Claim 17).)  In his opposition, plaintiff contends that he, as a heterosexual male prisoner, has been denied equal protection when compared to:  (1) California homosexual male prisoners, who are permitted to possess materials depicting topless men,[14] take showers with nude men, and live in cells (and engage in homosexual activities) with other homosexual men; and (2) heterosexual male prisoners incarcerated in other jurisdictions that do not ban the possession of sexually explicit materials.  (Dkt. No. 97 at 23-26.)

        "The Equal Protection Clause of the Fourteenth Amendment applies strict scrutiny if the aggrieved party is a member of a protected or suspect class, or otherwise suffers the unequal burdening of a fundamental right.  Government actions that do not involve suspect classifications will be upheld if they are rationally related to a legitimate state interest."  U.S. v. Juvenile Male, 2012 WL 206263, *8 (9th Cir., Jan. 25, 2012) (citations and internal punctuation omitted).  Neither the Ninth Circuit Court of Appeals, nor the Supreme Court, has held that sexual orientation is a suspect or quasi-suspect class for purposes of the equal protection doctrine.  See Dragovich v. U.S. Dept. of the Treasury, 2012 WL 253325, *6  (N.D. Cal. 2012), and cases cited therein; see also Perry v. Brown, 2012 WL 372713, *17 (9th Cir., Feb. 07, 2012); id. at *33 (J. Smith, concurring and dissenting in part).  Moreover, prisoners generally do not constitute a suspect class.  See Byrd v. Maricopa County Sheriff's Dept., 629 F.3d 1135. 1139 (9th Cir. 2011); United States v. Whitlock, 639 F.3d 935, 941 (9th Cir. 2011).  Accordingly, a rational basis analysis applies to plaintiff's claims.

        The Supreme Court, in emphasizing that it is the plaintiff's burden to demonstrate that a challenged policy lacks a rational basis, explained:

---

defendant had any significant role in the enactment, implementation, or enforcement of Section 3006(c)(17).

[14]  Plaintiff also contends that heterosexual female prisoners are permitted to possess materials depicting topless men (Dkt. No. 97 at 25); however, these prisoners are not permitted to possess materials depicting men who are frontally nude, thus blurring the distinction plaintiff attempts to make.

> [A] classification neither involving fundamental rights nor
> proceeding along suspect lines is accorded a strong presumption of
> validity.  Such a classification cannot run afoul of the Equal
> Protection Clause if there is a rational relationship between the
> disparity of treatment and some legitimate governmental purpose.
> Further, a legislature that creates these categories need not actually
> articulate at any time the purpose or rationale supporting its
> classification.  Instead, a classification must be upheld against
> equal protection challenge if there is any reasonably conceivable
> state of facts that could provide a rational basis for the
> classification. [¶]  A State, moreover, has no obligation to produce
> evidence to sustain the rationality of a statutory classification.  A
> legislative choice is not subject to courtroom factfinding and may
> be based on rational speculation unsupported by evidence or
> empirical data. . . . [C]ourts are compelled under rational-basis
> review to accept a legislature's generalizations even when there is
> an imperfect fit between means and ends.  A classification does not
> fail rational-basis review because it is not made with mathematical
> nicety or because in practice it results in some inequality.

Heller v. Doe by Doe, 509 U.S. 312, 319-20 (1993) (citations and internal punctuation omitted).

For the several reasons set forth throughout these findings and recommendations, defendants's reasons for enacting and enforcing Section 3006(c)(17), constitute reasonable, rational, and legitimate penological objectives.  A comparison of relevant practices among the several states is not a matter for federal judicial review.  See e.g. Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed [in their respective jurisdictions] to preserve internal order and discipline and to maintain institutional security").  Moreover, plaintiff's comparison between heterosexual and homosexual male prisoners fails to acknowledge that both groups are impacted by the ban on frontal nudity, particularly the ban on depictions of female and male genitalia, encompassed by Section 3006(c)(17).

Therefore, the court finds that Section 3006(c)(17) does not violate the Fourteenth Amendment's right to equal protection.

G. Qualified Immunity

Defendants contend, in the alternative, that they are entitled to qualified

33

1  immunity.  The qualified immunity analysis involves two inquiries:  whether the facts alleged by

2  plaintiff establish a constitutional violation, and whether the right at issue was clearly established

3  at the time.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Because plaintiff has not demonstrated a

4  constitutional violation of his rights, this court need not reach the question of qualified immunity.

5  IX.  Conclusion

6         Accordingly, IT IS HEREBY ORDERED that:

7         1.  Plaintiff's "Supplemental Opposition" (Dkt. No. 102), is stricken as an

8  impermissible surreply; and

9         2.  Paragraphs 5 through 7, of plaintiff's "Declaration" (Dkt. No. 97 at 45-46), are

10  stricken as impermissible hearsay.

11        In addition, for the foregoing reasons, IT IS HEREBY RECOMMENDED that:

12        1.  Defendants' motion for summary judgment (Dkt. No. 95), should be granted;

13  and

14        2.  Judgment should be entered for defendants.

15        These findings and recommendations are submitted to the United States District

16  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

17  after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

20  objections shall be filed and served within 14 days after service of the objections.  The parties are

21  advised that failure to file objections within the specified time may waive the right to appeal the

22  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23  DATED:  February 8, 2012

24

25                              KENDALL J. NEWMAN
                               UNITED STATES MAGISTRATE JUDGE

26  alex2773.msj

                                     34